**William H. KEOHANE, Plaintiff,**

v.

**SWARCO, INC., Morton G. Nussbaum, Fred C. Ward, Herbert Loewy, William L. Loughley, Joseph L. Halberstein, Amerace, Inc., Defendants.**

**Civ. No. 37040.**

United States District Court
N. D. Ohio, E. D.
Nov. 27, 1962.

Sidney D. L. Jackson, Jr., and James P. Garner of Baker, Hostetler & Patterson, Cleveland, Ohio, for plaintiff.

Joseph L. Halberstein, Marion, Ohio, for defendants Swarco, Nussbaum, Ward, Loewy and Loughley.

Edwin L. Mitchell, Marion, Ohio, for defendant Halberstein.

George M. Austin and Harry C. Nester, Cleveland, Ohio, for defendant Amerace, Inc.

BATTISTI, District Judge.

The Plaintiff, William H. Keohane, is an industrial engineer-consultant who, as part of his work, actively solicits and advises persons and corporations in the sale and purchase of other business enterprises. Defendant Swarco, Inc. (hereinafter called "Swarco"), a manufacturer of products from crude rubber, sold its assets to Defendant Amerace, Inc., (hereinafter called "Amerace"), another manufacturer of products from crude rubber. Nussbaum, Ward, Loewy, Loughley and Halberstein, the individuals named as Defendants, were officers of Swarco at the time of the sale. In the main, Plaintiff's dispute is with

Swarco and its officers. However, Amerace, in its purchase contract, agreed to indemnify Swarco and other Defendants against any claims arising from the purchase.

Plaintiff is a resident of Boston, Massachusetts. Defendants are all found in this district and none are residents of, or have their principal place of business in Massachusetts. The amount in controversy exceeds $10,000, thus the Court has jurisdiction of this dispute.

The events which led to this litigation have been well established by counsel at the trial. The issues of law have been briefed extensively. The facts, in substance are as follows:

Plaintiff voluntarily approached Defendant Nussbaum, President of Swarco, and stated that he knew of others (as yet unnamed) who might be interested in purchasing Swarco. Nussbaum advised Plaintiff that Swarco "was not for sale," but added that "the company can be bought." He was of the opinion that if the corporation were tendered an offer which would net each shareholder $30 per share, the corporation might be purchased. Plaintiff was also told that Nussbaum had no authority to solicit offers or brokers; and that if Plaintiff desired to seek prospective purchasers, he must do so at his expense and by looking to any purchaser for his commission or compensation.

Late in 1960, Plaintiff contacted the Eaton Manufacturing Company (hereinafter called "Eaton"). He reported to the Eaton officials that Swarco might be purchased. Starting in October, 1960, and continuing through April of 1961, representatives of Eaton, chiefly the Vice President in charge of acquisitions and his staff, conducted an investigation to determine whether to recommend to Eaton's Board of Directors that an offer be made to purchase Swarco. Swarco and its officers cooperated with the Eaton personnel by supplying them with confidential information relating to the company and by showing them around the Swarco facilities. Eaton engaged an outside consultant to make a market survey. The survey was not yet complete in early April. The staff in charge of acquisitions was anxious to see the results of the study before deciding whether the purchase of Swarco should be recommended to the Board of Directors of Eaton.

Eaton's representatives understood that if they purchased Swarco, Eaton would have to pay Plaintiff a commission. Although Plaintiff expected a fee equivalent to not less than 35¢ nor more than 50¢ per share of Swarco stock, no final or definite agreement as to the commission payable was ever entered into between Plaintiff and Eaton. In this connection, it is notable that Eaton's Vice President in charge of acquisitions had authority to enter into such a contract without Board approval. (Transcript, page 177.)

Plaintiff was advised by Swarco that he should not bring other prospective purchasers to survey the plant while negotiations with Eaton continued. It would seem that this order was motivated by the normal business caution against forewarning employees and others when a sale is being negotiated. Obviously, to have had a number of prospective buyers surveying the facilities would have been undesirable.

In April of 1961, the individual Defendants, Plaintiff and Eaton met with each other several times. At one of these meetings, Plaintiff and Eaton acquired definite knowledge that another company was negotiating for the purchase of Swarco. Parenthetically, it should be pointed out that when Plaintiff acquired this knowledge he did not assert any right to an exclusive agency with Swarco, nor did he object to Swarco's negotiations with another company. Thereafter, in the course of various telephone calls involving Eaton, Plaintiff, Nussbaum and Ward, it was made clear that if Eaton was to bid at all, it must bid soon. Other telephone calls to Nussbaum dispelled the threat of an immediate sale to an outside party. However, in fairness to Eaton and Plaintiff,

258

these calls left an inference that Swarco did not contemplate a sale to an outside purchaser without first giving notice to Eaton. The notice, it seems, was to be given gratuitously, because no binding obligation was ever mentioned or suggested by anyone.

Finally, on April 11, Eaton placed a call to Nussbaum, who was on vacation in Florida. Evidently Nussbaum was not aware of the fact that Ward was in New York negotiating with Amerace. On the basis of his knowledge at the time of the call, Nussbaum assured Eaton that it would have until April 20 to obtain the results of its market survey and to decide whether to make an offer. Immediately after this conversation, Nussbaum called Ward at the Swarco plant and was informed that Ward was in New York City. He then called Ward in New York, and Ward advised him that Amerace had met all of Swarco's conditions and that a sale had just been agreed upon. Nussbaum informed Ward of the conversation he had with Eaton and he requested that Ward call Eaton to advise it of the sale. Within the hour Ward called Eaton, informed it of the sale and Eaton in turn discontinued its activities relating to the possible purchase of Swarco.

On these facts, Plaintiff claims: (1) Plaintiff was an exclusive agent of the Defendant Swarco for the sale of that company, (2) Eaton "was ready, willing and able to purchase" Swarco upon the "terms" outlined by Swarco, (3) Swarco gave Eaton an option until April 20 to formalize an offer, (4) Eaton had promised (contracted?) to pay Plaintiff $370,-340 as broker in this transaction, and (5) Defendant breached the so-called option agreement to Plaintiff's detriment.

Obviously, at the first meeting between Plaintiff and Nussbaum, no agreement was reached which would make Plaintiff an agent of any of the Defendants. Nor can Plaintiff be considered an agent of Defendant Swarco at any later time. The facts do not prove either an express or implied consent by either Plaintiff or Defendant to an agency relationship.

 The Ohio rule places the burden of proof on Plaintiff to show that he was hired as a broker or agent. Tenbusch v. The L. K. N. Realty Co., 107 Ohio App. 133, 149 N.E.2d 42 (Cuyahoga County Court of Appeals 1958). At page 140, 149 N.E.2d at page 48, the Court of Appeals summarized the rule as follows:

"The burden of proof is upon the plaintiffs to establish a contract of employment or an offer upon the defendant's part which would result in a binding contract when a purchaser was produced. The mere asking and receiving of the price of property and the discussion of a commission when the broker himself is the party soliciting the listing of property, nothing more being shown, is insufficient as a matter of law to establish a basis for the recovery of a commission."

On the contrary, the testimony shows that neither party believed that an agency existed or believed that consent had been manifested. Consent under these circumstances is the *sine qua non* of the relationship.

 On the basis of Plaintiff's own testimony, Defendant Nussbaum specifically denied having the authority to engage Plaintiff as a broker. Since Plaintiff was aware of the absence of authority, it is unnecessary to explore Ohio law.[1] Throughout, Plaintiff knew that he must look to a purchaser for his commission. Swarco had no intention of promising him a fee for his work and, in addition, warned Plaintiff of the possible rejection of any offer he might procure. Plaintiff's subsequent dealings with Swarco were on behalf of his clients and himself. Neither the willingness of Swarco, or its officers, to negotiate with Plaintiff's clients, nor the instructions

---

1. However, as to the necessity of express authority, see Ohio Revised Code, Sect. 1701.76 and Schoettle v. Sarkes Tarzian, Inc., D.C., 191 Fed.Supp. 768 (1961).

to cease bringing in prospective purchasers made Plaintiff an agent of Swarco. A principal-agent relationship does not arise from a mere willingness to negotiate, nor does the relationship result from an instruction to cease or limit visitations.

There does not seem to be any serious question that Eaton was "able" to purchase Swarco. However, it is clear that Eaton had not yet concluded that it would, in fact, make a firm offer to purchase. Eaton's Board of Directors took no action whatever on the possible purchase of Swarco. The Eaton Vice President in charge of acquisitions had not yet presented the possible purchase to the Board. Indeed, there is no evidence that the Board had any knowledge whatever of the matter. Equally important is the testimony of the Eaton representatives that they had not entirely dismissed the possibility of negotiation on price— the most important requirement in this sale.[2] The cases urged by the Plaintiff do not go so far as to equate a ready and willing negotiator with a ready and willing buyer. While Eaton may have been an "able" buyer, it is quite clear that Eaton was not a "ready" and "willing" buyer.

Courts are often called upon to fill in details of an incomplete contract, offer or acceptance, but a Court will not presuppose the existence an offer by noting probable intention to make an offer. Nor will it be presupposed that the Board of Directors of a corporation is no more than a rubber stamp for certain of its executives.[3]

Even if the Court finds that Eaton was a ready, willing and able buyer, it must still conclude, in order to rule in favor of Plaintiff, that a binding agreement was in existence between Swarco and Eaton limiting Swarco's right of sale before April 20, and that Plaintiff was a third-party beneficiary of that contract by virtue of some agreement between Eaton and himself. (The possibility of Plaintiff being an agent of Swarco has already been passed upon and rejected in this opinion.) Certainly Swarco can have no greater obligation to Plaintiff than Eaton.

The evidence does not prove that either contract existed.

The Plaintiff must first show that Swarco granted Eaton an option. However, the most that can be said for Plaintiff's evidence is that an expression of opinion was given by Nussbaum as to the period in which an offer could have been made. Neither party made a commitment to the other. Eaton was free to discontinue its investigation without making an offer to Swarco, and Swarco was free to reject any offer which might be made.

2. Page 213 of the record, Logan Monroe, an Eaton executive was questioned by the court. (Lines 1–22)

"The Court: Did you think that was a closed matter, both subjects, the value of the stock and the finder's fee? Incidentally, did you know how many shares of stock there was?

"The witness: Approximately 750,000 shares. We knew that at the time—I knew exactly how many it was, and I knew exactly how much money was involved, and I think it was closer to $23,000,000 than the $22,000,000 that Mr. Austin mentioned. You asked me a very difficult question there, Your Honor. Until there is actually a signed contract, I think there is a sneaking suspicion in the back of all our minds that there may be further negotiations.

"The Court: Well, that is precisely what I am getting at. You had negotiated before as far as Eaton was concerned?

"The witness: Yes.

"The Court: And—

"The witness: Perhaps I should have said we pushed this into the background rather than dismissed it."

3. The evidence in this case is to the contrary. For example see page 203 of the record; cross examination of Logan Monroe. (Lines 16–19)

"Q — Now then, in a transaction such as involved here, or the Cleveland Worm & Gear, there had to be authority from the Board of Directors of Eaton to enter into a contract?

"A — Oh, yes."

Had any agreement existed between Eaton and Swarco obligating Swarco to refrain from entering into a contract of sale before April 20, this agreement would not be considered an option to purchase Swarco. The breach of such an agreement would, at best, give Eaton a right of damages for expenses incurred as a result of the promise made by Swarco. Accordingly, Plaintiff could receive nothing more than his expenses if he were to establish himself as a third-party beneficiary of Eaton's agreement. The theory in this case is that there has been a breach of an option to purchase and that, therefore, total commissions should be paid to Plaintiff. There is no evidence on which the Court could fix any other recovery. Plaintiff's studious avoidance of any other theory of recovery precludes any finding of an amount other than 50¢ or 35¢ per share of Swarco stock.

Neither of the officers of Eaton who testified at the trial of this case or any of the documentary evidence give any support to the theory that Eaton and Swarco intended to enter into any agreement. It would be anomalous to conclude that the activities of the parties should be construed so as to form a contract when it is obvious that neither had reached the point where they had intended to create the relationship.[4]

Finally, the Plaintiff has no right over against Swarco because he did not have a firm contract with Eaton. It is agreed that Plaintiff expected no more than 50¢ per share commission on a sale, and no less than 35¢. Eaton, however, had never agreed to pay that price.[5] The representatives of Eaton, with whom Plaintiff negotiated, had authority to contract with Plaintiff on his commission, but did not.

Had the proposed sale been consummated, Plaintiff might have become entitled to a reasonable fee.[6] Plaintiff did not present any evidence of what would constitute a reasonable fee. Plaintiff's expectations are not the test of reasonableness. Only three witnesses appeared in the trial—Plaintiff and two Eaton officials. Plaintiff did not give his opinion of a reasonable fee based on past experience. Therefore, even if damages were recoverable for Nussbaum's failure to keep negotiations open until April 20, there can be no recovery here because Plaintiff has not presented evidence on that question of damages.

The complaint also alleges that Amerace interfered with Plaintiff's successful sale. There is no evidence to sustain this contention.

Accordingly, judgment is granted for the Defendants.

4. The cross examination of William Mattie, page 170 of the record, negates any intention on Eaton's part. (Lines 3–8)

"Q — And in your conversation with Mr. Nussbaum he did not say to you or tell you that he would not entertain any proposal from any other company if it came in did he?

"A — No, he did not.

"Q — And you didn't ask him not to entertain any other proposal?

"A — I did not."

5. William Mattie's testimony at page 178 of the record is the clearest illustration of Eaton's intentions. (Lines 5–17)

"The witness: Well, all I can say is we discussed it and that we knew we would have to pay a commission. But as far as any formal agreement, any formal arrangements, we never did discuss a for-

mal agreement of any kind as far as commissions were concerned. But we did have an understanding that we would have to pay a commission.

"The Court: Were you assuming at the time that when you reached that point you would have to sit down and talk?

"The witness: Yes, I assumed that that's what we would do, sit down and discuss it if this deal was consummated."

6. The issue of plaintiff's right to a fee since he was not licensed as a broker in Ohio is not being decided by this Court. It is unnecessary to this decision. However, Plaintiff's legal claim to a fee would depend on a finding in his favor. See Ohio Revised Code, Sect. 4735.21.