102 N.J. Super. 1 (1968)
245 A.2d 202
M. DEAN KAUFMAN, INC., ETC., PLAINTIFF-RESPONDENT,
v.
AMERICAN MACHINE AND FOUNDRY COMPANY, DEFENDANT-APPELLANT, AND TUBOSCOPE COMPANY, ETC., DEFENDANT.
Superior Court of New Jersey, Appellate Division.
Argued March 18, 1968.
Decided July 10, 1968.
*3 Before Judges SULLIVAN, FOLEY and LEONARD.
Mr. William L. Dill, Jr. argued the cause for appellant (Messrs. Stryker, Tams & Dill, attorneys; Mr. William S. Tucker, Jr. on the brief).
Mr. Albert G. Besser argued the cause for respondent (Messrs. Hannoch, Weisman, Stern & Besser, attorneys).
The opinion of the court was delivered by FOLEY, J.A.D.
American Machine and Foundry Company (AMF) appeals from a $114,363.84 judgment entered in favor of plaintiff, M. Dean Kaufman, Inc. This judgment was based upon a jury verdict finding defendant liable for $94,348.94 in brokerage arising from the breach of a contract which obligated defendant to pay plaintiff a commission as a result of plaintiff's efforts in defendant's acquisition of Tuboscope Company, a named party defendant dismissed from the suit before trial with the consent of both parties. Plaintiff's suit, sounding in both contract and tort was submitted to the jury on the contract issue alone. After receiving the jury verdict in favor of plaintiff, the court, having calculated interest in the amount of $20,014.90, entered judgment for the sum stated above.
We reverse, ruling that this judgment was improvidently entered, and that the trial court erroneously denied defendant's motion for judgment made in accordance with R.R. 4:51-2(a) at the close of the evidence presented at trial.
*4 The factual circumstance which prompts this ruling revolves around an agreement by which defendant contracted to pay a commission to plaintiff which might best be described as a "finder's fee." The agreement arose in the following manner. Plaintiff, a corporation operated exclusively by M. Dean Kaufman, publicly offered services both as an industrial real estate agent and a business broker who would initiate and facilitate the merger and acquisition of businesses seeking such unions. It was in its secondary or "matchmaker" capacity that plaintiff, through Kaufman, first contacted AMF suggesting a potential interest which defendant might have in an undisclosed manufacturing company. This initial contact was made by an unsolicited letter dated April 3, 1959.
Defendant acknowledged its interest by return correspondence of April 15 requesting information relating to the name, profits, balance sheet and stockholder structure of the unnamed company, as well as the fee arrangement desired by Kaufman. Plaintiff supplied this information by letters of April 23 and June 9 stating that the fee was to be based upon percentages of acquisition cost on a scale sliding between 10% and one-half of 1% relating to candidates first presented by plaintiff which were ultimately acquired by defendant.
The statistical data and name of the initial prospect (American Seating Company) when forwarded to defendant were subjected to defendant's customary analysis preliminary to an "early" expression of interest in acquiring the merger candidate. This analysis served a twofold purpose by which the management of AMF maintained necessary internal controls which (1) fostered a cohesive program of corporate expansion; and (2) protected against multiple brokerage liability for finders' fees between matchmakers rivaling for commissions. Controlling the avenues of expansion involved statistical evaluations of the candidates' business and performance, while protection against the finders was effected through the use of a "source" file which AMF consulted *5 each time a merger candidate's name was proposed. This alphabetical candidate index, listing all brokers who had made prior proposals, permitted AMF to quickly determine whether the candidate had been offered before and, if it had previously been submitted, the "source" through whom the prior proposal was made. In this way AMF could establish the position of a prior broker before proceeding with a proposal initiated through a new broker. Therefore, AMF would display an interest in acquiring a candidate through the proposing matchmaker only after the preliminary analysis affirmatively demonstrated that: (1) the candidate was objectively interesting to AMF, and (2) the finders' fee arrangement was clear.
It was against this background of AMF's business custom that Kaufman, informed by his own personal research (home study and analysis of financial reports and business periodicals), proposed the names of five companies which he felt were merger candidates for union in the AMF corporate family. In order of their presentation the candidates were (1) American Seating Co., (2) Riley Stoker Co., (3) Baker Oil Co., (4) Tuboscope Company, (5) Hammond Organ Co.
After determining that a prior broker of American Seating Co. had made its proposal without the necessary foundation of authority to offer, AMF expressed to Kaufman its interest in acquiring this company based upon its "screening survey." Through Kaufman's dual agency a meeting between representatives of AMF and American Seating was held. As a result of the meeting the acquisition department reported to the executive management of AMF that because of potential trade regulation problems the American Seating proposal should not be pursued. The ultimate rejection is witnessed by a letter of December 11, 1959 from plaintiff to defendant in which Kaufman confirmed in substance prior conversations in which the offer to submit other proposals was extended to Kaufman by the director of planning at AMF.
*6 Kaufman orally presented Riley Stoker Co. at a personal meeting with defendant's assistant director of planning. Since defendant's source file indicated prior presentation, priority as broker of record was given to plaintiff only after the prior broker's absence of interest was first established. Preliminary meetings were not held between the candidate and defendant in this instance because the screening survey indicated that Riley did not fall within the projected areas of AMF's growth interest.
Baker Oil Co., submitted as a third candidate, was also deemed ineligible as not being within a preferred area of planned expansion. Although it, too, was previously submitted by another broker Kaufman was given priority when plaintiff's exclusivity was determined.
Tuboscope was offered fourth. Records of the correspondence between plaintiff and Tuboscope provide a valuable insight into plaintiff's operations. Soliciting the management of Tuboscope, plaintiff sought authority to offer the company (i.e., to act as broker, agent or matchmaker) to a "well-known company enjoying a volume about three times" that of Tuboscope. This uninvited solicitation was made by Kaufman to Tuboscope in letters respectively dated March 11 and 29; April 19, 20 and 29; and May 2, 1960. These letters share two common themes. Kaufman promised Tuboscope strict confidence, protected by a guaranteed anonymity; and divisional autonomy for Tuboscope within AMF's conglomerate family. Responding to Kaufman's letters the president of Tuboscope explicitly refused (in letters of March 18, April 14 and 27, and May 6, 1960) to invest Kaufman with authority to offer Tuboscope as a merger or acquisition candidate. Notwithstanding these specific written denials of authority Kaufman not only submitted Tuboscope as a candidate to AMF but also temporized his written promise of secrecy by naming Tuboscope as the company proposed. This disclosure was made by Kaufman during a telephone conversation with AMF's assistant director of planning on the morning of March 18, 1960.
*7 AMF, now fearing that Kaufman was "shopping around for deals" held up conferring on plaintiff authority as broker of record until Kaufman could present an expression of his authority to submit Tuboscope as a merger candidate. When no evidence of this basic agency was forthcoming AMF proceeded no further on this proposal, listing Kaufman's name under Tuboscope in the "source" file index. This information remained in defendant's active records until November 1960 at which time it was forwarded to AMF's record storage in Brooklyn.
On December 15, 1960 plaintiff offered the final candidate, Hammond Organ Co. In addition to noting the fact that Hammond was rejected for financial reasons, it serves well to preserve the language used by Kaufman to assure AMF that he had the basic authority to submit Hammond as a potential mate. The words were originally used by Kaufman in a letter dated December 15, 1960:
"A short time ago, the president of the Hammond Organ Co. invited us to discuss this matter with him. Consequently, we believe that the requirement set forth in the first sentence of the third paragraph of your letter of the 9th, namely, that generally there be a clear indication of the availability and our authority to present the company, can be readily met in this instance."
Returning to Tuboscope, Kaufman's last contact in this matter was by letter of May 6, 1960 from Tuboscope's president to plaintiff. From that date no further efforts to obtain authority from Tuboscope and to bring AMF and Tuboscope to the bargaining table were made. On July 30, 1963 Kaufman was informed by news media of AMF's impending acquisition of Tuboscope.
Notwithstanding Kaufman's knowledge that the Tuboscope acquisition arose from, and was negotiated through a source totally unrelated to him, he claims his right to be recognized as the broker of record on the grounds that he first brought Tuboscope to the attention of AMF and that when defendant failed to notify Kaufman of that merger at *8 the time it was proposed, defendant tortiously interfered with plaintiff's prospective economic advantage (counts 1 and 2) and breached the commissions contract existing between the parties at that time (counts 3 and 4).
Plaintiff's theory demands that the acquisition of Tuboscope be drawn into sharper focus. The disaster of Hurricane Carla in Galveston in 1962 created a serious financial problem for Navion Aircraft Company; this in turn affected the financial stability of Tusco Corporation, a broad based holding company which operated Navion as a wholly owned subsidiary, forcing Tusco into bankruptcy. The principal owner of Tusco, William Hopkins, discussed this corporate insolvency with Robert Stockmar, a 50% partner with Hopkins in the eight-state distributorship called "Western Navion" of Long Beach, California. As a result of this Hopkins requested Leslie Osborne, an employee of the distributorship, to call his brother Stanley Osborne, then an executive of Olin Mathieson Chemical Corp. to see if he could help Tusco out of its problems and thus be of assistance to Navion. Olin-Mathieson was not interested and Stanley Osborne called Carter L. Burgess, chairman of AMF's board, on which Osborne also sat. Burgess, in turn, called John Tullis in Shreveport, La., executive of the "AMF Industrial Products Group," who investigated the feasibility of acquiring Navion. Tullis rejected Navion but indicated that Tusco held other assets which might prove desirable.
A meeting was held in Houston before Referee in Bankruptcy Burns, and was attended by defendant corporation represented by Tullis and one Yount; Tusco's representatives; Leslie Osborne; Stockmar; and the trustee in bankruptcy. As a result of this meeting defendant tendered an offer for Tuboscope, of which Tusco held 43%, which the trustee in bankruptcy had to liquidate. This first offer was rejected.
Thereafter, the interest of the corporations was activated and defendants, using the bankruptcy to their favor, convinced the management of Tuboscope that the union was *9 sound. The "stock for stock" tax-free exchange comprehended the acquisition by AMF of a $9,369,787.50 asset. The actual commissions collected totaled $25,000 being split evenly by Leslie Osborne and Robert Stockmar. This commission was authorized and paid by the trustee in bankruptcy.
Noticed of this transaction plaintiff initiated a suit claiming a right to $94,348.98 commission. Following an adverse jury verdict defendant's post-trial motions were denied, and this appeal followed.
Tracing the "finders" commercial history from banking to corporate mergers the "middleman's" distinctive features are easily recognizable. However, here, essentially the finder was required to be an agent of both parties and, so, in ruling that the judgment should have been entered on defendant's trial motion, we hold that in contracts of this type, absent specific contractual language to the contrary, there is an implied prerequisite of "authority to offer" which must exist between the candidate and the agent-broker. The agent's authority, express or implied, is the essence of the relationship presently before the court which distinguishes the agent-finder from an employee-analyst.
Although "finders' fees" arise from the banking industry, Towers v. Doroshaw, 5 Misc.2d 241, 15 N.Y.S.2d 367, 375 (Sup. Ct. 1957), this custom is viewed now in its most rewarding and effective use as a primer of corporate expansion, e.g., Lindeman v. Textron, Incorporated, 143 F. Supp. 955, 957 (S.D.N.Y. 1956); Keohane v. Swarco, Inc., 211 F. Supp. 256, 257 (N.D. Ohio 1962), aff'd 328 F.2d 615, 616 (6 Cir. 1964). Without attempting to chart the historical development of "finders' fees" we refer to the New York Supreme Court's clear distinction between "finders" and conventional brokers as stated in the cases of Ames v. Ideal Cement Co., 37 Misc.2d 883, 235 N.Y.S.2d 622 (Sup Ct. 1962). There, the trial court, holding the finder not restricted by the New York Statute of Frauds when claiming *10 a "finders' fee" on a multi-state corporate merger, drew the following distinctions:
"The same distinction between a finder (who finds, interests, introduces and brings the parties together for the deal which they themselves negotiate and consummate) and a broker (whose duty is to bring the parties to an agreement on his employer's terms) has been noted in all the decisions dealing with the subject (see, for example, P.W. Chapman & Co., Inc. v. Cornelius [2 Cir., 39 F.2d 555] * * *; Lindeman v. Textron, Inc. * * *; Kuffler v. List [D.C. 144 F. Supp. 776] * * *; Bittner v. American-Marietta Company, D.C. 162 F. Supp. 486. A more precise designation for a finder would appear to be an `intermediary' or a `middleman.'
The services performed by finders may vary from case to case. But their distinction from the status of a broker, if the circumstances of the particular case require such a distinction to be drawn, lies in their bringing the parties together with no involvement on their part in negotiating the price or any of the other terms of the transaction. Of course, with respect to real estate, commissions are payable only to a licensee and only when he produces a buyer who agrees to seller's terms, unless otherwise expressly agreed." (235 N.Y.S.2d, at p. 625).
Examining our jurisprudence, we discover that it is only in the context of a "finder" seeking to circumvent licensing or regulatory legislation that the New Jersey courts have employed the anomalous term of "finder's fee." See Corson v. Keane, 4 N.J. 221, 225-226 (1950) holding that an unlicensed broker was precluded from collecting a finder's fee by operation of New Jersey Real Estate Broker's Licensing Act.
However, the kindred concept of a "middleman" has long been recognized in New Jersey cases dealing with the sale of land. Lanze v. Shechtman, 137 N.J.L. 63, 64 (Sup. Ct. 1948); Feist v. Jerolamon, 81 N.J.L. 437, 440 (E. & A. 1910); Sternberger v. Young, 73 N.J. Eq. 586, 589 (Ch. 1907). These cases indicate that the relationship of the parties herein must be tested by the fundamental principles common to the law of agency and contracts.
While New Jersey courts have not determined the legal effect of the particular circumstance before the court, *11 we feel that this finders agreement existed as a contract which, by the actions of the parties, impliedly required the agency authority of the matchmaker to propose the name of a candidate. It is here noted that American Seating, Riley Stoker and Baker Oil were proposed on expressed authority, and Hammond Organ was received on an implied authority.
Before analyzing the contract we would say that while the counts of plaintiff's complaint sounding in tort were here properly dismissed, we do not intend, in requiring on these facts, that the agent's authority be express or implied, to indicate any views on the finder's rights in the proper instance to press his remedies in tort for the wrongful interference with his prospective economic advantage, see Mayflower Industries v. Thor Corp., 15 N.J. Super. 337, 339 (Ch. Div. 1951), affirmed o.b., 9 N.J. 605 (1952), or the wrongful interference with contractual relations, Harris v. Perl, 41 N.J. 455, 461 (1964).
Here, returning to the agency-contract issue, AMF acknowledges the agreement with Kaufman and the plaintiff admits his absence of authority to act as Tuboscope's agent. This narrows the issues in debate to whether the contract between defendant and plaintiff was in existence at the time Tuboscope was acquired; and, if it was, did defendant owe plaintiff the obligation to inform him of the situation when it arose from an admittedly unrelated source?
Answering the latter problem first, since it serves as the basis for the properly dismissed tort counts, Tuboscope's express refusal to confer the authority of agency upon Kaufman rendered any further considerations by AMF of Kaufman's authority to offer Tuboscope purely gratuitous. Legally AMF's obligations ceased. We make this ruling fully aware of the fact that at the time of the Tuboscope acquisition an employee-analyst of defendant, named Fulbright, became aware of Kaufman's prior unauthorized presentation. Defendant's past custom of checking the "source" file had no legal relationship to Kaufman in the Tuboscope matter. We state the fundamental rule again:
*12 "An agency relation exists only if there has been a manifestation by the principal to the agent that the agent may act on his account, and consent by the agent so to act." Restatement (second), Agency, § 15, p. 82 (1958).
Tuboscope, the principal, unequivocally refused Kaufman's proffered agency both before and after Kaufman had identified Tuboscope to AMF in direct contradiction to his repeated guarantees of secrecy. Because of the lack of agency defendant had no obligation to inform plaintiff of its proposed acquisition of Tuboscope.
Finally, the contractual relationship of AMF and Kaufman must be construed to impliedly limit plaintiff's authority to present only situations in which Kaufman was authorized by the candidate to make the proposal of its name to defendant. Plaintiff's relationship with defendant in the Tuboscope proposal was initiated on April 23, 1959. At this time plaintiff could evidence no expression of its authority to offer Tuboscope. Therefore, barring tortious collusion between the suitor and the candidate, and here there was none, the plaintiff's opportunity to supply proof of the requisite authority lapsed after a reasonable time and after the expiration of that time the contract between AMF and Kaufman, insofar as Tuboscope was concerned, terminated. Geo. H. Beckmann Inc. v. Charles H. Reid & Sons, Inc., 44 N.J. Super. 159, 168-169 (App. Div. 1957). While in a certain complex of facts it may be necessary to pinpoint the exact date of termination, in the present circumstance, after a consideration of all the facts, it is sufficient for us to say that the passage of three years in which plaintiff admittedly made no effort to secure authority from Tuboscope to act as its agent precludes a finding that plaintiff and defendant were contractually related on the date in 1963 when AMF was noticed of Tuboscope through an acknowledgedly independent source.
From these proofs adduced at trial "fair minded men cannot honestly differ as to the conclusions to be drawn * * *" Franklin Discount Co. v. Ford, 27 N.J. 473, 487 (1958). *13 There was no factual dispute for the trier and disposition should have been made on the legal principles that controlled.
Accordingly, the case is remanded to the trial court for entry of judgment in favor of the defendant.