Robert MOSCONE, Plaintiff,

v.

WHYY, INC., Defendant.

Civ. No. 80–58.

United States District Court, D. New Jersey.

Oct. 12, 1982.

Kaufman, Garshell & Soller by Carl R. Soller, East Orange, for plaintiff.

McCarter & English by Kathleen Miko, Newark, and Montgomery, McCracken, Walker & Rhoads by Alison Douglas Knox and Linda Dale Hoffa, Philadelphia, Pa., of counsel, for defendant.

OPINION

BIUNNO, Senior District Judge.

This is a diversity suit filed here to recover on a claim for fees arising out of the bailment (lease or rental) of a mobile TV "truck" owned by defendant WHYY (a Philadelphia TV station) to Entertainment and Sports Programming Network, Inc. (ESPN), for 150 production days between July 1, 1979 and June 30, 1980.

Trial was by the court without a jury, and so this opinion reflects the findings of fact and conclusions of law, as authorized by Rule 52(a), F.R.Civ.P.

The claim is a State law claim, and so the applicable law is State law, *Erie R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). The "choice of law" principles to be applied are those of New Jersey.

New Jersey's current rules follow the "center of gravity" concept, an abstract idea bearing no resemblance to the entirely physical principle the label indicates. With due regard to the applicable rhetoric and euphemisms, the court is satisfied that New Jersey has little to do with the subject matter of the controversy, and that the "center of gravity" selected would probably be Pennsylvania. However, there does not seem to be any significant difference between the pertinent law of New Jersey and Pennsylvania, and so no firm choice need be made. See *Rohm & Haas v. Adco.,* 689 F.2d 424, (CA 3, 1982), at p. 429, point [5].

In fact, plaintiff relied mainly on a Pennsylvania decision, along with one from New York and another from the U.S. District

Court in the Eastern District of Pennsylvania. He could not find any pertinent New Jersey cases. The court has found several, as well as a decision of this Circuit based on New Jersey law, all of which are discussed later. All of them evidently express substantially the same principles from a substantive aspect, yet, while the court examines all of them, it is of the view that Pennsylvania law applies and controls. There is no "federal common law" for the subject field, as there is for labor law, see *Plumbers & Pipefitters v. Local 334,* 452 U.S. 615, 101 S.Ct. 2546, 69 L.Ed.2d 280 (1981), citing *Lincoln Mills,* 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957) on this point; and *Clayton v. Automobile Workers,* 451 U.S. 679, 101 S.Ct. 2088, 68 L.Ed.2d 538 (1981), citing *Republic Steel,* 379 U.S. 650, 85 S.Ct. 614, 13 L.Ed.2d 580 (1969) as well.

*Undisputed facts.*

Only two witnesses testified at trial: The plaintiff, Robert Moscone, and a former officer of WHYY, Jean F. Mason III. Testimony given by another former officer of WHYY, Robert Hall, and by Dudley Freeman who arranged to book the WHYY truck in February and April, 1979 for use by ESPN, was introduced by marking their depositions in evidence. Moscone and Mason were also examined on oral deposition before trial.

Moscone had started in the TV field in 1955 with station WGBH in Boston. He went to WBZ, Boston, as news director and was there from 1964 into 1967 when he took a leave of absence to go to Reeves teletape as lighting director. He returned to WBZ in 1968 but after a brief period returned to Reeves as a line producer into 1971. The field was "quiet" at that time in the New York area where Reeves is, and at the suggestion. of Robert Hall (whom he had known from Boston) went to WHYY in Philadelphia as production manager, and later became vice-president of production and sales.

WHYY owned a mobile TV unit or "truck" (evidently a trade term, as used in "The Guys in the Truck" a comedy about sports and TV currently showing at an off-Broadway theater). The truck was essentially a portable TV studio with three cameras, a professional video-tape recorder (VTR), a slow motion disk (slo-mo) and suitable console control equipment, monitors and the like, all capable of producing live TV broadcasts or of taping material for later broadcast.

The truck had been obtained for WHYY's own remote use at first, but when the station did not get funding to pay for a rather expensive relocation of its antenna, its own use of the truck (as well as its own studios) was sharply cut back and these facilities were put out for rental to others to raise funds.

Moscone's function thus became one largely of arranging for commercial rental of the truck and the studios. Hall estimated that both sources generated some $200,-000. gross a year; Moscone estimated that the truck generated some $100,000. gross a year. Neither figure is critical and no one attempted to verify from books and records.

The truck could be sent out mostly along the Boston-Philadelphia-Baltimore-Washington corridor. It could not be used for some activities that needed more than 3 cameras (except as back-up), and travel time was a limiting factor. Most of the competition for rental was in New York.

Moscone left WHYY in July-August, 1978, but had been aware for about a year before then that he would no longer be needed, so it was not a critical blow. Also, he had been commuting to Philadelphia from New York. Before leaving, he had talks with Hall, who suggested that Moscone look for commercial business for WHYY's truck, and he would get a commission on whatever he was able to send to WHYY.

The oral arrangement was put in a letter from Hall to Moscone dated August 22, 1978 (though Moscone felt he had the letter when he left early that month). It calls for 10% of the final billing, payable when the commercial client pays, as a commission on commercial client leases that Moscone secured for WHYY. The letter said the ar-

rangement would begin with a lease for the slo-mo to Steve Ullman for use at the Meadowlands. It closed by inviting questions if there were any. Moscone said he had none and asked none.

Nothing much seems to have developed from this arrangement, at least until January, 1979. Moscone had relations of some kind with two or three companies in New York, including Reeves, that had trucks available but whether he booked any dates for them in this period does not clearly appear.

Sometime in January, 1979, Moscone phoned Mason at WHYY. Mason was then director of operations (having been hired in September, 1978) and in charge of booking the truck. Moscone reported that Dudley Freeman had a number of dates to book the truck and would be phoning. Freeman did phone, dates were set for February and April, and the truck was sent out. This was accomplished even before the confirming letter of February 8, 1979 since the first date is two days before. The name of DBD Associates to which the letter (and later billing) went was furnished by Freeman.

In his deposition, Freeman testified that DBD Associates was a corporation using the initials of his wife, his son and himself. He said he was in the truck rental business and had had a number of his own TV trucks and also obtained trucks from others.

His arrangements with WHYY were to meet scheduled events to be broadcast or taped by ESPN for University of Connecticut, Fordham, and the like. Freeman's arrangement with ESPN was never clearly established either at deposition or trial, and no ESPN witness was called by either side. Thus the court cannot tell whether Freeman billed ESPN at his own rates (possibly based on his own cost plus markup) or on a cost plus basis.

Whatever the arrangement was, a falling out took place before the booked April dates, and when Freeman phoned to report to Mason that there was a "problem" with the dates, Mason protested that they were firm dates, and when Freeman demurred, Mason said he was going to call ESPN himself if Freeman had no objections. He did call and directly booked some April dates, which were kept.

There is no dispute among the witnesses that by about February 10, 1979 Mason learned that ESPN was using the trucks booked to Freeman's DBD Associates. He learned this from Keith Scamerhorn, the head "babysitter" from WHYY who accompanied the truck in the field for security, setting-up, maintenance and repair.

Moscone believed he had told Mason of ESPN's participation, but the court is satisfied from all the evidence that his recollection is incorrect. However, this minor conflict is of no legal significance because Moscone's formal admissions concede that he had no dealings with ESPN but with Freeman, and did not know and was not known to any officer or director of ESPN (Items 20 and 21, Admissions filed April 28, 1980). Freeman's own deposition is that he had his own business in booking trucks for use by ESPN.

In any event, Moscone was paid for the February bookings, see voucher of April 26, 1979 and check of May 31, 1979, both of which read "as per agreement with Robert Hall." Both documents refer to "DBD Mobile Unit leases".

Freeman testified at deposition that after his talk with Mason about the problem with the April dates, he called Moscone to suggest he do something. The only indication is that Moscone called Mason, not ESPN. The evidence is clear that after the falling out between ESPN and Freeman, it was Mason alone, not Moscone or Freeman, who achieved the April bookings.

The testimony, as well as the documents in evidence, show that while Mason at first resisted Moscone's commission claim for the April dates, he negotiated a compromise under which he deducted from the commission $460. of overtime billed to Freeman for the February bookings but never paid, and gave up a $500 cancellation charge for February 10, 1979.

Thus, the case involves no dispute about commissions to Moscone for the February

and April dates. An attempt by Freeman to have WHYY "take care of him" for the April dates was brushed aside and never pressed further by Freeman.

No further business with ESPN followed the April dates until Mason learned, as it became known generally in the trade, that ESPN was to receive a substantial grant from Getty Oil and was planning a rapid expansion from a small, regional operation to a national one.

Mason was aware that it would take a while for ESPN to acquire its own trucks for an expanded program, and decided to offer WHYY's truck on a contract basis. He made a date, flew to Connecticut on July 3, 1979, negotiated a "letter of intent" and brought it back. A formal agreement providing for 150 dates to use the WHYY truck was eventually drawn and signed as of August 1, 1979.

It is in respect to those bookings that Moscone advances his commission claim here.

*Applicable law.*

Suit was initially filed in the Superior Court of New Jersey, with WHYY served within the State through its registered agent in Camden, and was removed here on petition. The complaint does not plead the law of any particular jurisdiction, nor does the answer. Under Rule 9(3) of the N.J. Rules of Evidence, which superseded NJSA 2A:82–27, et seq., the trial court is required to apply the law of New Jersey in the absence of an adequate basis for taking judicial notice of the law of some other jurisdiction, see annotations to 1982 Edition, N.J. Rules of Evidence (Gann Law Books).

Had there been a claim that the matter is governed by the law of some other jurisdiction, the choice to be made would be between the law of New Jersey and the law of either Pennsylvania or New York. Moscone is and was a citizen of New York for many years, and the letter of August 22, 1978 recording the oral arrangement was mailed to him there. WHYY's principal place of business is in Philadelphia, although it is a Delaware corporation. Moscone worked for WHYY in Philadelphia and the truck was booked out of Philadelphia for use along the northeast corridor. If there were a difference in the law, the court is satisfied that the Superior Court would apply Pennsylvania law. However, the applicable law is essentially the same in New York, New Jersey and Pennsylvania, so no choice of law is called for.

It was said during summation that the pretrial order specified that New Jersey law would govern. No such statement is in the order, or in any other filed paper. Most likely, the effect of N.J. Evidence Rule 9(3) was talked about at the pretrial conference, and this would call for applying New Jersey law in the absence of a suitable basis, by notice or request, to apply some other law.

The claim is advanced as a claim for a "finder's fee" rather than as a broker's commission, possibly on the theory that the major difference between the two is that the "finder" is not called upon to engage in the negotiations leading to the transaction, although the finder is required to establish a causal connection between his activity and the event; as a "middleman", he must be the efficient procuring cause of the transaction. See, *Amerofina, Inc. v. U.S. Industries,* 232 Pa.Super. 394, 335 A.2d 448, at p. 453, points [8] and [9–11], and cases there cited from a number of jurisdictions.

The letter of August 22, 1978 does not use either the term "broker", or "finder", or any other term for that matter. It merely speaks of the "verbal agreement relative to your commissions for commercial client leases, which you secure for WHYY, Inc." It also spells out that the agreement "is for 10% of the final billing amount and will be forwarded to you upon receipt of payment from commercial clients."

In the context of the activity, which Moscone himself engaged in at the station's end while employed there, the function is more like that of a booking agent than it is like that of a finder or a broker.

As Dudley Freeman explained the activity in his deposition, marked in evidence as Exh. P–4, most station owners of remote trucks are not necessarily marketing or

sales people but technical or engineering people. They would engage persons like himself to book the use of their remote truck to those who needed them for particular dates and places.

He himself began work in this field as an owner of remote trucks, starting with one and eventually owning six. That enterprise, known as Northern Teleproductions Corporation, was disposed of by merger in 1975, and DBD Associates was started up to book trucks for users on a commission basis, which eliminates the capital investment, interest rates and other fixed expenses that accompany ownership. In some instances, a user with a TV program package would go to him with a schedule of 20 or 30 games on a schedule and have him make the arrangements, which sometimes included billing. He would then arrange for remote trucks to be provided for those occasions, charging a fee to his customer (the user) of 10% to 20%.

He had done business before with WHYY in 1977 when he had a Boston client who needed a remote truck and some studio time, and was put in touch with Moscone by a mutual friend in Boston who had worked with Moscone at WGBH there. He met with Moscone and Hall in Philadelphia, and was told he would be paid a 10% commission on such bookings.

When he booked for the truck for February, 1979, he did so through Moscone. He knew that when he left WHYY he was representing their mobile unit. He called Moscone for the bookings, although he had many contacts and truck owners that he might have called, because Moscone was a friend, was out of work at the time and was looking to get business for WHYY, Teletape and Unitel, and called him because he knew Moscone would then get the commission.

He made separate calls for the February and April dates, in both cases to Moscone.

Such transactions, for specific dates at specific locations cannot be regarded as establishing a claim of "ownership" of the client for future bookings in the absence of some express provision or established custom for one or another kind of exclusivity.

At trial, Moscone testified that it was not part of the agreement that WHYY would not book the truck except through him, or that he was expected not to book trucks except for WHYY.

Under these conditions, there would be no commission payable to Moscone unless he produced the booking and the bill was paid.

This relationship is more like that of a travel agent who is paid a commission for an airline, or a steamship company, or a hotel, if he produces the traveler for the particular occasion. The travel agent does not "own" the traveller. If he writes a ticket for A on United Airlines, he gets a commission. On another trip, he may write a ticket for the same traveller on TWA. Or, the traveller may buy a ticket directly from United Airlines or TWA, in which case no commission is payable to the travel agent.

In light of all the evidence, the court finds that the arrangement was one under which there was no obligation to pay any commission to Moscone unless he was the producer of the particular booking or lease.

Even if the arrangement was a "finder's" arrangement, it is clear that to recover as a finder Moscone would have had to show that he had authority from the customer, in this case, ESPN, to book trucks for them. The evidence is that Moscone had no part whatever in booking the one-year contract for 150 days that is the subject of this suit. His only contact was with Dudley Freeman, who had asked him to book the February and April dates so that he would receive a commission. Nothing in Freeman's testimony so much as suggests that he was asked by ESPN to book trucks on an extended schedule or basis after the Getty Oil funds became available. Nor does any of his or Moscone's testimony suggest that either one of them called Mason at WHYY to attempt to book the truck for the 150 days over the period of a year, although the news of the funding was well known in the trade.

The decision in *Kaufman Inc. v. Amer. Mach. & Foundry,* 102 N.J.Super. 1, 245

A.2d 202 (App.1968) sets out a very thorough analysis of the "finder's" relationship, noting that it originated from the banking industry, citing New York and Ohio cases, and likening it to the "middleman" or "matchmaker" relation. See, "The Joys of Yiddish", by Leo Rosten, Pocket Books, N.Y., under "shadchen" [1]

■ As *Kaufman* points out, it is essential to recovery by a "finder", "matchmaker" or "middleman" that he be authorized by the person produced to tender the proposal. In *Kaufman,* Tuboscope had explicitly refused to allow Kaufman to offer it as a merger or acquisition candidate even though Kaufman promised strict confidence and a guaranteed anonymity, despite which refusal it tendered the name to AMF. The absence of authority to submit Tuboscope as a prospect was held to be fatal to Kaufman's claim, and to require reversal of a favorable jury verdict judgment with direction to dismiss the complaint.

See, also, *Inventive Music v. Cohen,* 617 F.2d 29 (CA 3, 1980), applying New Jersey law on a finder's claim, as requiring that the finder be the "efficient producing cause" of the transaction.[2]

*Findings of Fact.*

1. WHYY, Inc. agreed orally, and recorded that agreement in writing by the Hall letter of August 22, 1978, to pay Moscone a 10% commission on commercial leases of its remote truck procured by him, payable on final billing and payment by the lessee.

2. The agreement has never been terminated and still is in full force and effect.

3. The only bookings for which Moscone was the efficient producing cause were the February bookings to DBD Associates, for which he was paid.

4. His claim to commissions for the April bookings to DBD Associates was disputed because the bookings were cancelled by Dudley Freeman, and some dates salvaged by Mason's efforts in dealing directly with ESPN, but the dispute was resolved by compromise and settlement. The settlement amount was paid.

5. The commercial client produced by Moscone for the February and April bookings was DBD Associates, not ESPN, or University of Connecticut or Fordham University, any of whom were free to book, or be booked, for the use of WHYY's truck directly and without obligation to Moscone, with whom none had any agreement or other legal relationship.

6. DBD Associates was free, if it had so chosen, to book the February and April dates directly with WHYY had it so chosen. Moscone's claim to a commission for the February and April dates rested on the authorization from DBD Associates to book the dates on its behalf.

7. ESPN did not authorize either DBD Associates nor Moscone to book any dates for the WHYY truck after the April dates.

8. Knowledge of ESPN's good fortune in receiving a grant from Getty Oil, and its plans to expand as a consequence, were well

---

**1.** Other decisions referring to "finder's fees", aside from those mentioned in the opinions cited in the text, but not discussing the features of the term are:

*In re Estate of Burke,* 48 N.J. 50, at p. 57, 222 A.2d 273 (1966), mentioning the payment of a "finder's fee" on the sale of an expectancy under a trust, which was contingent on survival by the remainderman of · the life tenant.

*Peoples Nat'l Bank v. Fowler,* 73 N.J. 88, at p. 95, 372 A.2d 1096 (1977), mentioning payment of a finder's fee to arrange a loan.

*Kugler v. Koscot Interplanetary, Inc.,* 120 N.J.Super. 216, at pp. 224, 225 and 237, 293 A.2d 682 (Ch.1972), mentioning "finder's fees" payable for enlisting new participants in a franchising program.

*In re Adoption, etc.,* 165 N.J.Super. 591, at p. 596, 398 A.2d 937 (Law, 1979), referring to the payment made to a Chilean lawyer in connection with an adoption as "more like a broker's fee or finder's fee."

The status of a "middleman" or "finder" is to be distinguished from that of the "air trader" who acts without legal authorization and who is often paid by both sides of a transaction under a false impression that authority exists.

**2.** The difference between the arrangement here and an "exclusive" is well illustrated by *Shribman v. Miller,* 60 N.J.Super. 182, 158 A.2d 432 (Ch. 1960) and *In re Miller,* 90 N.J. 210, 447 A.2d 549 (1982).

known in the trade at the time that WHYY's employee, Mason, conceived the notion of offering its truck for an extended schedule.

9. Neither Moscone nor DBD Associates suggested the approach developed by Mason and negotiated by him on July 3, 1979.

10. Moscone's claim to commissions was not limited to the production of new customers, as testified to by Hall (in deposition), since DBD Associates had previously booked rentals with WHYY in 1977, yet his bookings for it were recognized for the February and April dates.

CONCLUSION.

█ Taking all aspects in the light most favorable to Moscone, his claim to commissions is at best dependent on a debatable fact issue (a) whether he was the efficient procuring cause, or (b) whether he had been authorized by ESPN to seek the bookings made from any remote truck owner.

The burden is on Moscone to establish one or the other of these ultimate facts by a simple preponderance of the evidence.

The court finds that the evidence, taken as a whole, without regard to who produced it, falls far short of establishing either of these, let alone both.

Final judgment will be entered for defendant and against plaintiff. A separate order is entered.