**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2619-20

IN THE MATTER OF THE
ESTATE OF MARK A. RAYNER,
Deceased.

_____

Argued January 11, 2023 – Decided November 9, 2023

Before Judges Accurso, Firko, and Natali.

On appeal from the Superior Court of New Jersey, Chancery Division, Monmouth County, Docket No. P-000454-19.

William Adam Friedman argued the cause for appellant Carol Petty (Gaeta Law Firm, LLC, attorneys; Anthony N. Gaeta and William Adam Friedman, on the briefs).

Allen S. Kaplan argued the cause for respondent Colleen Kelly Rayner (Kaplan & Bookbinder, attorneys; Allen S. Kaplan, on the brief).

The opinion of the court was delivered by

FIRKO, J.A.D.

In this will dispute, plaintiff Carol Petty, the sister of decedent Mark A.

Rayner, appeals from three orders granting summary judgment in favor of

defendant Colleen Kelly-Rayner, decedent's widow. The orders awarded defendant the intestate estate, which comprises decedent's entire estate, under the Pre-Marital Will Statute, N.J.S.A. 3B:5-15, and appointed defendant as administratrix. In addition, the court found the Omitted Children Statute, N.J.S.A. 3B:5-16, would apply to decedent's two after-adopted children in the event defendant was not the surviving spouse under the Pre-Marital Will Statute, barring recovery to plaintiff under either statute. Plaintiff also appeals from an order denying her application for counsel fees and costs.

Because we conclude there are genuine issues of material fact that precluded summary judgment as a matter of law under Rule 4:46-2(c), we reverse the orders granting summary judgment to defendant and remand for a plenary hearing. We also vacate and reverse the order denying plaintiff's application for counsel fees and costs.

I.

Viewed in the light most favorable to plaintiff, Templo Fuente De Vida Corporation v. National Union Fire Insurance Company of Pittsburgh, 224 N.J. 189, 199 (2016), the pertinent facts are as follows. On January 31, 1989, decedent executed a will, which is the subject of the matter under review. He named plaintiff the executrix and sole heir. At the time, plaintiff was decedent's

only living relative.  In 2004, plaintiff and decedent "had a falling out" that lasted for about ten years.  The dispute centered on distribution of monies from their late uncle's estate and decedent, the executor, notifying plaintiff she would not receive a distribution because of debt she owed him and their uncle's estate.  Decedent advised plaintiff she did not deserve any share of their uncle's inheritance.  In 2004, decedent threatened to sue plaintiff for monies she owed him.  In response, plaintiff conveyed a rental property located in Tuckerton or Little Egg Harbor,[1] a major asset in decedent's estate, to him because plaintiff claimed she could not afford to fight him.

In 2003, decedent met defendant.  They married four years later in 2007— eighteen years after decedent executed his will—and lived at decedent's Farmingdale house, which was his pre-marital property and remained titled in his sole name during the marriage until his death.  After marrying, decedent and defendant adopted a set of twins who were born in September 2009 and have special needs.  Decedent never revised his will after getting married and adopting the twins.  Defendant's alcoholism led to marital problems between plaintiff and defendant.

---

[1]  The record is unclear as to whether the property is located in Tuckerton or Little Egg Harbor.  This is not germane to our decision.

On March 9, 2014, decedent and plaintiff apparently mended their relationship as evidenced in an email decedent sent to plaintiff. In his March 9, 2014 email to plaintiff, decedent stated he planned to work "[eight] more years" and retire at "sixty-four-years old." He added:

> Farmingdale house will be sold for about 500K.
>
> Tuckerton house will be sold for about 489K.
>
> Dump the Condo for about 150K.
>
> I am trying to sell the Canada house now but the appraisal came in low at 530K.
>
> I have a buyer for Pelican Bay, SC for my lot but not sure if that will get anything more th[a]n 90K. That investment cost me about 150K lost.
>
> Then I will move to Delaware . . . Colleen and kids will not come there so that will be the end of the Rayner marriage . . .

On May 13, 2014, decedent sent plaintiff another email stating:

> I make investments so I [c]an retire. . . . I will sell the Tuckerton property for 500K and pay off my house here in Farmingdale. I will leave you the condo for $125K FOR YOU[R] RETIREMENT. You will not be left out . . . you['re] my sister . . . blood. I will be fair. Colleen known my wishes . . . Colleen gets the Farmingdale [m]ansion. 500K in [v]alue. I will not have my families fight over money. You are Executor at this point. You screw this up you will be without anything. Take what I offer you and be happy, otherwise I will

4

give the Rayner Estate to the church. All of it. 1.6 million [d]ollars.

The record does not indicate if decedent ever sold the Tuckerton property and paid off the mortgage on the Farmingdale property and is devoid of any evidence as to the values of these properties net of outstanding mortgages and liabilities.

In February 2015, defendant obtained a temporary restraining order (TRO) against decedent and moved out of the Farmingdale home and into her sister's basement with the children. Defendant alleged in the TRO complaint that decedent threatened her life and the children's lives while he was intoxicated. She described his behavior as "erratic," and she was fearful because he kept guns in the house. A few days later, defendant agreed to dismiss the TRO and enter into a civil restraining order that mandated he stop drinking, undergo treatment, and have supervised visitation with the children. Defendant and the children continued to live with her sister and decedent remained in the Farmingdale home.

Shortly thereafter, decedent emailed plaintiff about defendant and the children moving out of the marital home and the TRO she obtained against him. Decedent explained, "I think [defendant] is still pissed because she is not in my will, no[ne] of them are. I believe the Rayner money stays with the Rayners. One day I will tell [you] where everything is so you can come and get what is

5

yours." Plaintiff tried to talk to decedent about his email, but he answered, "I don't wish to talk about it right now. Still trying to get kids and [defendant] back home, but I think she has left for good."

On May 14, 2015, decedent emailed plaintiff about defendant "playing this game" and may never come home. Defendant explained it was not "practical" for him at the age of fifty-seven to "hold 270K mortgage on a 500K house at $2[,]800 a month." He added defendant "will try to come after the Rayner estate but nothing is in her name, and she is not in the will so she loses." Decedent told plaintiff, "I will try to protect our assets and you are still sole beneficiary." He later added, "The real estate is safe for now. It's all for you." And, decedent wrote to plaintiff, "[i]t['[1]]s my final wishes in life and [defendant] cannot change it." Following their separation, decedent "made it clear" to plaintiff and his close friends that the marriage was over and defendant wasn't interested in reconciling. Decedent also informed plaintiff about his unemployed status and that he needed money and insurance for his children.

In June 2015, decedent got a job with Future Technologies, Inc. Decedent named defendant and the children as the beneficiaries on his employer provided life insurance policy and defendant as the sole beneficiary on his 401(k) plan, which were perquisites of his employment. Plaintiff and decedent continued to

communicate through emails without mention of his estate, and periodically he would express his love for his children and hoped for a reconciliation with defendant. In August 2015, according to defendant, she filed a complaint for divorce as "a tough-love tactic" in the hopes decedent would get "scared" and undergo counseling, but he ultimately refused to do so. On September 13, 2015, decedent sent plaintiff an email stating "[n]ow she (Colleen) is dragging me back to court for more money, so I am going to jail because I will not pay anymore so the Rayner estate is in your hand[s]."

On September 27, 2015, decedent sent plaintiff an email stating: "I was served divorce papers this past Friday . . . good thing is the papers say she (Colleen) can come after what was acquire[d] during marriage. I own all stuff before marriage and hoping that saves me." On November 27, 2015, decedent emailed plaintiff, "my wife is using my kids as hostages, and she knows I would do anything to see my kids. I will try to protect our assets and you are still sole beneficiary."

On December 19, 2015, decedent expressed his final wishes to plaintiff in an email: "I wish I had happy news for you but I don't. The real estate is safe for now. It's all for you. Of course Colleen is pissed about that but she cannot do anything. It's my final wishes in life and she cannot change it."

On December 12, 2016, defendant dismissed her divorce complaint. The dismissal order indicated the "parties are reconciling" and the matter is "dismissed without prejudice." Between 2016 through 2019, the parties filed joint marital income tax returns. In 2017, decedent sent defendant an email stating in part, "I love you Colleen and our wonderful children . . . . They will be [heirs] to my estate. My kids will always be protected."

By 2018, plaintiff's and decedent's relationship was strained. In a February 18, 2016 email from decedent to plaintiff, he mentioned "She (Colleen) was afraid I was going to call the IRS on her and I did threaten to do so because I was mad. I would never hurt anyone, I love my wife and kids."

In October 2018, plaintiff informed decedent that she would no longer communicate with him until he got "serious" about getting help for his alcohol abuse and taking care of himself. In February 2019, decedent emailed plaintiff, even though they were not on speaking terms, to inform her that he was flying to Florida for the Super Bowl. He stated, "If anything happens to me you must come home and handle the Rayner estate. [One] million dollars at your fingertips." Plaintiff lives in Wyoming.

A month before his death, decedent and defendant entered into a written agreement stating they were married but living separate and apart. The

agreement acknowledged defendant had custody of the children and that her aunt was purchasing a home for defendant as a "gift" because defendant and the children had been living in her sister's basement, and defendant required financial assistance from her aunt.

At her deposition, defendant testified her aunt was a co-signor on the mortgage and was not "handing" her a home. Defendant intended to move into the new home with the children. The agreement provided decedent waived any interest in the home purchased by defendant's aunt and agreed the home "shall not be subject to equitable distribution in the event of the divorce or dissolution of the parties." Defendant also agreed decedent could visit the children with her permission if he remained alcohol and drug free.

Defendant regularly brought the children to visit decedent, performed household chores, brought groceries, and prepared meals for him until she found him dead in his home on June 3, 2019. At the time of his death, defendant and the children were still named as beneficiaries on his employer provided life insurance policy and defendant was still named the sole beneficiary of his 401(k) plan.

On August 9, 2019, defendant's attorney sent a letter to plaintiff's attorney itemizing the probate assets of the estate as follows:

9

- Farmingdale house - $516,000 (based on 2019 tax assessment, which is 100%)

- Less outstanding mortgage balance of $278,000

- 660 Green Street - $391,800

- Green truck – zero value

- Pelican Bay, SC – own 7% - Loss

- Interest in Canada property - $3,000 to $15,000

- Bank account - $37,000

The record does not indicate any documentation was provided with the letter to support the values stated.

As the surviving spouse, defendant filed a caveat objecting to the probate of decedent's will and for relief under the Pre-Marital Will Statute. In response, plaintiff filed a verified complaint and order to show cause (OTSC) in the Chancery Division, Probate Part, seeking to vacate defendant's caveat, declare the Pre-Marital Will Statute and defendant's elective share under N.J.S.A. 3B:8-1 inapplicable, appoint plaintiff executrix, and for an award of counsel fees. Defendant filed a verified answer and counterclaim seeking her intestate share under the Pre-Marital Will Statute, plaintiff's removal as the nominated executrix, appointment of herself as executrix, and for an award of counsel fees and costs.

The court denied plaintiff's OTSC, allowed the parties to choose a temporary administrator, and granted defendant leave to re-file her counterclaim. In a subsequent case management order, the court appointed an attorney for the children after determining defendant's interests could be adverse to theirs and ordered mediation. On behalf of the children, their counsel filed an answer and counterclaim seeking distribution of the entire estate to them as intestate heirs in the event defendant's claim to her intestate share was denied by the court and for the establishment of special needs trusts for each child. The mediation was unsuccessful.

The parties moved for summary judgment and both motions were denied without prejudice as premature pending discovery and an accounting of the non-probate assets defendant received from decedent. The parties engaged in discovery and conducted depositions. Plaintiff propounded interrogatories upon defendant. One interrogatory required defendant to "[s]tate whether the [d]ecedent ever expressed to [the defendant] that he intended to leave his entire Estate to the [p]laintiff." The response was "no." At her deposition, defendant was asked a similar question and provided the same answer but later on in the deposition, changed her answer:

> Q.   I'm going to ask you the question one more time:

Did [defendant] ever communicate to you that he was going to leave his estate to [plaintiff]?

A.    Not that I can recall in any serious conversation.

Q.    Okay. Please tell me about the conversations that you did not consider serious. What did he say regarding leaving his estate [to] [plaintiff]?

A.    If he was drinking he would say I'm going to leave everything to my friends.

Q.    Okay. [Plaintiff], did he say [plaintiff]?

A.    I guess so he did. I don't understand. I don't understand what you're –

Q.    It's a simple question. You testified initially that – I asked you a very simple question which was: Did [defendant] ever communicate to you that he intended to leave his estate to [plaintiff]? You said I cannot recall. I then admonished you and reminded you that you're under oath to tell the truth. I've taken not[e] that you are wearing a mask that says "be not afraid" which indicates a biblical reference. So that tells me that you're a person who takes oaths and religion seriously and you have sworn an oath to tell the truth. You then testified that – you have basically said not that you recall, but he did not in any conversation in a serious way. So that implies that he did at some point make a statement that he was leaving his estate to his sister. And I'm asking you what he said during those conversations which you have characterized as not being serious. You then testified that he said he'd leave it to his friends which isn't leaving it to [plaintiff]. So there are

12

a number of contradictions that I'm offering you the chance under oath to correct. . . .

A.   Okay.  [Defendant] would always say that he's rich and he would say, if we were arguing or having a fight, I'll leave everything to [plaintiff]. I'll leave everything to my friends.  You'll have nothing. We never sat down and looked at a piece of paper and said, this is what's going to happen. This is what I have, this is what I don't have, ever.

Q.   But he did say at some point that he would leave his estate to [plaintiff], correct?

A.   Yes.

After obtaining information about the non-probate assets, the parties renewed their motions.  In her initial certification in support of summary judgment, defendant stated decedent had an "unstable" relationship with plaintiff, and she was not actively involved in his life.  Defendant also certified she never executed any documents waiving her spousal inheritance rights, as alleged by plaintiff.

In support of her renewed summary judgment motion, defendant certified she received $174,667.18,[2] inclusive of life insurance proceeds, interest, and the 401(k) plan.  From that sum, defendant had to pay funeral expenses of $12,614;

---

[2]   The record also shows the amount was $175,314.71, and this is the amount cited by the court in its opinion.

repair the roof on the former marital home at a cost of $19,500; pay property tax arrearages on the estate's real properties in the amount of $10,156; and pay decedent's outstanding debts on the former marital home totaling $7,304.

Defendant also certified she lost $800 per month in child support payments from decedent; now pays $2,041 per month for COBRA medical insurance; and $100 per month for car insurance—expenses that decedent used to pay. Defendant's monthly out-of-pocket loss is $2,941. Defendant projected she will incur at least $317,628 in expenses for the children until they reach eighteen years of age on account of decedent's demise.

The parties also dispute the value of the probate estate. Plaintiff claims the estate is worth $850,000, and defendant claims the estate is worth only $350,000. No real estate appraisals were included in the record to substantiate these values, and no inheritance tax return was provided.

Plaintiff countered defendant was estranged from decedent and contested a reconciliation occurred in December 2016 when defendant dismissed her divorce complaint. Plaintiff submitted a certification stating decedent "made it clear" to her that he and defendant "were never getting back together," and defendant told him she "had no intention of ever reconciling." According to plaintiff, decedent harbored "animus" towards defendant. Decedent told

14

plaintiff that "he had not gone through with the divorce because it would have been extremely costly," and he had "serious concerns" defendant would spend "anything she received from the settlement."

Regarding the filing of joint tax returns, plaintiff certified decedent told her it was in his and defendant's "mutual interest to take the deduction for the children and the business losses" they reported and had "nothing to do with an eventual reconciliation."  Plaintiff certified "it was no surprise" decedent never prepared a new will after he was married, and he always "made clear to plaintiff" that he intended to "preserve and leave" as much of the "Rayner Estate" to her as he possibly could.  Plaintiff certified decedent felt "strongly" about what had been in the "original Rayner family" should be left to "remaining blood kin," which is something their "father emphasized" to them.  According to plaintiff, decedent "knew" about his will, "hadn't forgotten about it," and relied upon it to ensure plaintiff received as much of his Estate as possible.  Plaintiff certified this was decedent's "dying wish," and he was confident defendant's family's wealth would "protect" her and their children.

In opposition to defendant's motion, plaintiff submitted a certification from decedent's friend Paul Thompson.  In his certification, Thompson stated, "[a]ccording to Mark (decedent), he and the [d]efendant had come to an

agreement whereby he would not make any claims upon her inheritance, in exchange for which she would agree not to make any claims upon his Estate." Thompson certified "[t]hese agreements show that Mark (decedent) and the [d]efendant were not, in fact, reconciling. Rather they were continuing to engage with each other on a formal and informal basis to address issues related to their property and Mark's access to their children." In addition, Thompson certified that "both during and after his marriage fell apart, Mark often confided in me . . . regarding his plans for his Estate, which he intended to bequeath entirely to his sister, . . . [p]laintiff . . . ." Thompson reiterated that after decedent and defendant separated, he mentioned plaintiff was "getting everything," and defendant was getting "nothing."

Plaintiff submitted another certification from decedent's friend Karen Hogg. In her certification, Hogg claimed decedent "made it clear to [her] and our mutual friends that he was leaving his entire estate to this sister . . . [p]laintiff . . . and he never waivered in that commitment." Hogg certified decedent "believed" that both of his children and defendant would be "well provided for by [d]efendant's [a]unt," who is "very wealthy." Hogg certified decedent told her "on several occasions" that he had "reached an agreement with [d]efendant" and he would "disclaim any interest in her expected inheritance from her [a]unt

16

in exchange for her agreement to disclaim any interest in his Estate." Based on decedent's statement, Hogg certified decedent made it "perfectly clear to her," Hogg's "husband, and all of our friends, that he wanted [plaintiff] to receive his entire Estate" and wanted plaintiff to serve as "his Executor."

Defendant submitted a reply certification. She certified while still residing with decedent, he "would drink until he passed out" even while babysitting the children. Defendant stated decedent "went for approximately ten years without speaking to . . . plaintiff." Regarding the home that her aunt was supposed to assist financing, defendant stated her aunt "changed her mind" and is leaving her money to charity instead. Defendant certified decedent refinanced the mortgage on the Farmingdale house in the amount of $300,000, which allowed him to "take out some of his equity, which he spent before his death." According to defendant, she will be "homeless" if plaintiff prevailed on her motion. Defendant claims decedent "bragged" about how he would take care of her and the children.

In an oral decision following argument, the court denied plaintiff's motion to probate the will and granted defendant's application to serve as administratrix. The court found as a matter of law that decedent's thirty-year-old will "was not in contemplation of marriage, nor does it indicate any specific intent not apply."

The court noted that decedent and defendant had been married for twelve years. The court determined that the non-probate assets defendant received were insufficient to meet her expenses and the expenses of the two minor special needs children. The court noted plaintiff's assertion that decedent's non-probate assets were sufficient to support defendant and two minor special needs children to completely lack "merit" and "any believability."

The court observed defendant dismissed the divorce action, reconciled, defendant and decedent represented to the public they were married, and raised two children who have "disorders," and may never be able to live independently. The court stated the two adopted children are treated as naturally born children under the laws of inheritance.[3]

The court also noted that if defendant's claim had failed under the Pre-Marital Will Statute, then the children—who were born twenty years after decedent executed his will—would be entitled to inherit decedent's estate under the Omitted Children Statute because the will did not mention any future natural

---

[3] "The entry of judgment of adoption shall establish the same relationships, rights, and responsibilities between child and the adopting parent as if the child were born to the adopting parent in lawful wedlock." N.J.S.A. 9:3-50(b). When applying this State's intestate law, "an adopted child shall have the same rights of inheritance as if born to the adopting parent in lawful wedlock." Ibid.

born or adopted children. The court determined plaintiff could never inherit any part of decedent's estate under either the Pre-Marital Will Statute, or the Omitted Children Statute in the event the Pre-Martial Will Statute did not apply. No determination was made by the court as to the value of decedent's estate in reaching its decision. The court permitted the parties to submit counsel fee applications. Plaintiff sought in excess of $100,000 in counsel fees. Defendant objected and certified she only earns $15,000 to $18,000 per year.

Thereafter, the court denied plaintiff's request for counsel fees and costs. The court found N.J.S.A. 3:B:5-15—the Pre-Marital Will Statute—was applicable. The court noted the will was dated January 31, 1989, decedent married October 12, 2007, and has two minor special needs children. The court stated in its order that there were "[n]o reasonable grounds based on facts for claim." The court also denied defendant's request for frivolous litigation fees under N.J.S.A. 2A:15-59.1(a).[4] The court awarded $9,751 in counsel fees to the

---

[4] N.J.S.A. 2A:15-59.1(a) provides:

> A party who prevails in a civil action, either as plaintiff or defendant, against any other party may be awarded all reasonable litigation costs and reasonable attorney fees, if the judge finds at any time during the proceedings or upon judgment that a complaint, counterclaim, cross-claim or defense of the nonprevailing person was frivolous.

court appointed attorney for the children and awarded $40,447.50 in counsel fees to defendant's attorney. Memorializing orders were entered. This appeal followed.

## II.

Before us, plaintiff contends the court did not consider the facts in her favor, contrary to the summary judgment standard and that the court disregarded her certification, the certification of decedent's friends, accompanying exhibits, and deposition testimony, and erred in refusing to consider decedent's probable intent under the third exception to the Pre-Marital Will Statute. Plaintiff asserts defendant repeatedly offered inconsistent discovery responses and testimony raising issues about credibility that should not have been summarily decided by the court. Plaintiff maintains the court found as a fact that decedent and defendant were engaged in a "multi-year reconciliation" that continued until he died and that they never agreed to disclaim their interest in each other's estates.

Plaintiff argues she established that defendant was amply provided for outside decedent's will through his employer provided life insurance and 401(k) beneficiary designations in lieu of a testamentary provision. Plaintiff asserts she should be appointed executrix under the will. She also contends the court abused its discretion in denying her counsel fee application because reasonable grounds

existed for her claims, which the court found were not made in bad faith. We agree with plaintiff that the court made factual findings on these critical issues on a disputed record.

A.

When reviewing an order granting or denying summary judgment, this court applies "the same standard governing the trial court." Oyola v. Liu, 431 N.J. Super. 493, 497 (App. Div. 2013). We owe no deference to the motion judge's conclusions on issues of law. Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995). Courts ruling on summary judgment are required to view the evidence presented in the light most favorable to the non-moving party to determine whether the materials presented "are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995).

"An issue of fact is genuine only if, considering the burden of persuasion at trial, the evidence submitted by the parties on the motion, together with all legitimate inferences therefrom favoring the non-moving party, would require submission of the issue to the trier of fact." Ibid. In other words, summary judgment is properly granted "[w]hen the evidence 'is so one-sided that one party

21

must prevail as a matter of law.'" Davis v. Brickman Landscaping, Ltd., 219 N.J. 395, 406 (2014) (quoting Brill, 142 N.J. at 540).

The non-moving party bears the affirmative burden "to make a complete and comprehensive showing why summary judgment should not be entered." Lombardi v. Masso, 207 N.J. 517, 556 (2011). To satisfy this burden, the non-moving party "must 'demonstrate by competent evidential material that a genuine issue of fact exists.'" Globe Motor Co., v. Igdalev, 225 N.J. 469, 479-80 (2016) (quoting Robbins v. Jersey City, 23 N.J. 229, 240-41 (1957)). The court must then determine "whether a rational factfinder could resolve the alleged disputed issue in favor of the non-moving party," id. at 481 (quoting Perez v. Professionally Green, LLC, 215 N.J. 388, 405-06 (2013)), bearing in mind "neither the motion court nor an appellate court can ignore the elements of a cause of action or the evidential standard governing the cause of action," Bhagat v. Bhagat, 217 N.J. 22, 38 (2014).

B.

Probable Intent

We turn first to plaintiff's argument on appeal that the court misapplied the equitable doctrine of probable intent. According to plaintiff, decedent's probable intent was for her to inherit his estate as contemplated in his will rather

22

than defendant and the two children because decedent provided for defendant and the children outside of his will by naming defendant the beneficiary on his life insurance policy and 401(k) plan.  Plaintiff argues the court misapplied the Pre-Marital Will Statute, which created an "absurd result."

"In interpreting a will, [the court's] aim is to ascertain the intent of the testator."  In re Est. of Payne, 186 N.J. 324, 335 (2006).  Our Supreme Court has adopted the "doctrine of probable intent," which recognizes courts should give "primary emphasis" to the testator's "dominant plan and purpose" as it appears "when read and considered in . . . light of the [will's] surrounding facts and circumstances."  Ibid. (quoting Fid. Union Tr. Co. v. Robert, 36 N.J. 561, 564-65 (1962)).  The doctrine of probable intent is also codified in N.J.S.A. 3B:3-33.1.  Subsection (a) addresses wills:

> The intention of a testator as expressed in his [or her] will controls the legal effect of his [or her] dispositions, and the rules of construction expressed in N.J.S.A. 3B:3-34 through N.J.S.A. 3B:3-48 shall apply unless the probable intent of the testator, as indicated by his [or her] will and relevant circumstances, is contrary.

The doctrine of probable intent has "a 'broader and more liberal approach to will construction . . . .'"  In re Est. of Flood, 417 N.J. Super. 378, 381 (App. Div. 2010) (quoting In re Est. of Burke, 48 N.J. 50, 63 (1966)).

Defendant claims that plaintiff was not on speaking terms with decedent when he died and had not spoken to him for several years before his death. Defendant maintains plaintiff has no relationship with the twins and did not comfort them at decedent's funeral. In addition, defendant asserts she was the one who found decedent's will and gave it to plaintiff through counsel at her request, in response to plaintiff's attack on defendant's credibility that she was hiding information about decedent's estate.

Plaintiff argues she presented competent evidence to invoke the probable intent doctrine that the court ignored. Plaintiff's evidence, in addition to the will, consisted of multiple emails from decedent to her stating defendant is not named in his will, and certifications from two friends stating decedent intended to leave plaintiff his estate rather than his spouse and children.

Counsel for the children points out there is nothing in the record to indicate decedent intended to disinherit his disabled children. The certifications submitted by plaintiff and defendant's deposition testimony—which is contradictory in and of itself—are in direct contrast to the statements made in defendant's certification, raising issues of fact. Plaintiff asserts defendant and counsel for the children failed to file responding statements to her statement of

A-2619-20

undisputed facts as required by Rule 4:46-2(b), and therefore, such facts should be deemed admitted in analyzing plaintiff's motion for summary judgment.

The Pre-Marital Will Statute reads in part:

> a. If a testator's surviving spouse married the testator after the testator executed the testator's will . . . the surviving spouse . . . is entitled to receive, as an intestate share, no less than the value of the share of the estate the surviving spouse . . . would have received if the testator had died intestate, unless:
>
> (1) it appears from the will or other evidence that the will was made in contemplation of the testator's marriage to the surviving spouse . . . ;
>
> (2) the will expresses the intention that it is to be effective notwithstanding any subsequent marriage or domestic partnership; or
>
> (3) the testator provided for the spouse or domestic partner by transfer outside the will and the intent that the transfer will be in lieu of a testamentary provision is shown by the testator's statements <u>or is reasonably inferred from the amount of the transfer or other evidence.</u>
>
> [N.J.S.A. 3B:5-15(a) (emphasis added).]

Subsection (1) is not applicable here because decedent's will was not made in contemplation of his marriage to defendant. Subsection (2) is also not applicable because decedent's will does not express the intention it is to be effective notwithstanding his marriage to defendant. We now address subsection (3).

C.

Pre-Marital Will Statute

Subsection (a) (3)

Plaintiff contends the court improvidently held the $175,314.71 non-probate assets defendant received from decedent's life insurance policy and 401(k) plan did not satisfy subsection (a)(3) of the Pre-Marital Will Statute, and thus, the doctrine of probable intent could not be invoked. In plaintiff's view, the non-probate assets defendant received satisfied subsection (a)(3), and the court improperly determined there was sufficient information to reject plaintiff's claim that decedent's will controls.

To satisfy subsection (a)(3), the testator must have provided for the spouse by a transfer made outside the will with the intent the transfer was in lieu of a testamentary provision. N.J.S.A. 3B:15(a)(3). That intent may be shown where "the testator provided for the spouse or domestic partner by transfer outside the will and the intent that the transfer be in lieu of a testamentary provision is shown by the testator's statements or is reasonably inferred from the amount of the transfer or other evidence." Id.

Plaintiff contends decedent's statements evinced his "testamentary scheme" whereby she would receive his probate assets and defendant and the

children would receive his non-probate assets in lieu of a testamentary provision. She also asserts the evidence supports the inference that "decedent was adamant that his probate assets pass" to her and not defendant.

In delivering its decision, the court did not analyze whether the terms of decedent's will remained his testamentary intent throughout the remainder of his life. The court's decision is problematic because it focused on defendant's financial need in light of the fact she is raising two special needs children and only received $175,314.71 in non-probate assets. On this basis, the court found defendant was an omitted spouse because she was not provided for sufficiently pursuant to N.J.S.A. 3B:5-15(a)(3) and was entitled to her intestate share of the estate. A reading of the court's decision persuades us it was imposing a personal sense of fairness on the situation as it came to pass. It apparently seemed unfair to the court that defendant be left without sufficient financial means to support the children.

In our review, the analysis of the doctrine of probable intent, the Pre-Marital Will Statute, and Omitted Children Statute turns on first determining the value of decedent's estate net of liabilities. Then, the court should analyze and compare the net value of the estate with the amount of the non-probate assets of $175,314.71 defendant received. Our review of the record convinces us this task

27

was not undertaken but is vital before deciding the contested issues of fact presented.

Although the parties agreed defendant received $175,314.71 outside the will, they had wildly divergent views of the value of the decedent's probate assets consisting largely of the Farmingdale and Tuckerton properties, with plaintiff asserting they totaled $850,000 and defendant contending they totaled $350,000. There was nothing in the record direct or extrinsic that supports either value. Without a finding on the value of the probate assets, the court could not make a finding as to whether the amount of the transfer of the non-probate assets was sufficient to allow an inference that the decedent intended to provide for defendant and the children outside the will under N.J.S.A. 3B:5-15(a)(3). Because the court resolved critical factual questions on a disputed and incomplete record, we conclude summary judgment was improvidently granted.

III.

Plaintiff does not challenge the court's finding that the Omitted Children Statute would have applied here if the Pre-Marital Will Statute did not. We briefly note the Omitted Children Statute provides in part:

> a. Except as provided in subsection b., if a testator fails to provide in his [or her] will for any of his [or her] children born or adopted, the omitted after-born or adopted after the execution of his [or her] will, the

omitted after-born or after-adopted child receives a share in the estate as follows:

(1) If the testator had no child living when he [or she] executed the will, an omitted after-born or after-adopted child receives a share in the estate equal in value to that which the child would have received had the testator died intestate, unless the will devised all or substantially all of the estate to the other parent of the omitted child or to a trust primarily for the benefit of that other parent and that other parent survives the testator and is entitled to take under the will.

(2) If the testator had one or more children living when he [or she] executed the will, and the will devised property or an interest in property to one or more of the then-living children, an omitted after-born or after-adopted child is entitled to share in the testator's estate as follows:

(a) the portion of the testator's estate in which the omitted after-born or after-adopted child is entitled to share is limited to devises made to the testator's then-living children under the will.

(b) the omitted after-born or after-adopted child is entitled to receive the share of the testator's estate, as limited in subparagraph (a), that the child would have received had the testator included all omitted after-born and after-adopted children with the children to whom devises were made under the will and had given an equal share of the estate to each child.

(c) to the extent feasible, the interest granted an omitted after-born or after-adopted child under this section must be of the same character, whether equitable or legal, present or future, as that devised to the testator's then-living children under the will.

A-2619-20

[N.J.S.A. 3B:5-16.][5]

Defendant characterizes decedent's failure to mention the children in his will as an omission, implying the children should take under the statute permitting portions of an estate to pass to omitted children. Id. On remand, the court shall address whether the Omitted Children Statute—including any subsection— applies under the circumstances of the case following the plenary hearing and proofs adduced at the hearing.

IV.

Despite her unsuccessful challenge, plaintiff filed a Rule 4:42-9(a)(3) application to have the estate pay for her attorney's fees. Plaintiff contends the court abused its discretion in denying her fee application because she had

---

[5]  We note that the Omitted Children Statute contains a nearly identical subsection to the Pre-Marital Will Statute. N.J.S.A. 3B:5-16(b)(2) provides:

> b.  Neither subsection a.(1) nor subsection a.(2) applies if:
>
> (1) it appears from the will that the omission was intentional; or
>
> (2) the testator provided for the omitted after-born or after-adopted child by transfer outside the will and the intent that the transfer be in lieu of a testamentary provision is shown by the testator's statements or is reasonably inferred from the amount of the transfer or other evidence.

reasonable cause to bring her "case of first impression" based on the interplay between the doctrine of probable intent and the Pre-Marital Will Statute, and her claims were brought in good faith.

In a will contest, the allowance of counsel fees and costs under Rule 4:42-9(a)(3) is discretionary. In re Reisdorf, 80 N.J. 319, 327 (1979). "'[F]ee determinations by trial [judges] will be disturbed only on the rarest of occasions, and then only because of a clear abuse of discretion.'" Packard-Bamberger & Co. v. Collier, 167 N.J. 427, 444 (2001) (quoting Rendine v. Pantzer, 141 N.J. 292, 317 (1995)). "While deference will ordinarily be given to discretionary decisions, such decisions will be overturned if they were made under a misconception of the applicable law." O'Neill v. City of Newark, 304 N.J. Super. 543, 550 (App. Div. 1997).

Because we are remanding for a plenary hearing, we vacate and reverse the court's orders on the parties' applications for counsel fees and costs. Following the plenary hearing, the court shall consider anew any request for counsel fees and costs. We offer no dispositive determination on the factual and legal issues that may be presented as the matter proceeds on remand.

In sum, we reverse the orders granting summary judgment to defendant, and we vacate and reverse the court's orders on counsel fees. The matter is

31

remanded for a plenary hearing consistent with our opinion. Jurisdiction is not retained.

Reversed and remanded.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-2619-20